[No. 36905.    Department One.    January 9, 1964.]

NORMAN MESHER, *Respondent,* v. THOMAS A. CONNOLLY, *Appellant.**

*Reported in 388 P. (2d) 144.

*Corbett, Siderius & Lonergan,* for appellant.

*Rutherford, Kargianis & Shinn,* for respondent.

HILL, J.—This is an adverse possession case involving what was formerly residential property.

The plaintiff, Norman Mesher, is, and has been since 1934, the owner of a 50-foot lot;[1] its western boundary is a street, and its eastern boundary is an alley. When the plaintiff purchased this lot there was (and it still exists) a concrete walk extending some 62 feet of the lot's total east-west dimension of 110.08 feet. This walk is from the front door to the back door of his house and for 62 feet of its total length runs along the north side of his house. A recent survey indicated that the northerly edge of that walk was, for all practical purposes, the north line of the lot as platted. The plaintiff maintains that he has always believed that his north line was 3 feet north of the northerly edge of that sidewalk. The eaves of his house extend over and beyond the sidewalk and onto the adjoining lot varying distances, the maximum being $10\frac{1}{2}$ inches. The northerly edge of this sidewalk, having been constant during the entire occupancy of the premises by the plaintiff, furnishes a point or line of reference for more transitory objects such as a fence and a garage concerning which there is frequent reference in the testimony.

Through the years (since 1934) there had been no occasion to determine the boundary line between the plaintiff's property and the contiguous lot on the north, until the defendant (Corporation of the Catholic Archbishop of Seattle) acquired it for the purpose of using it as a parking lot' in connection with an adjacent church. It naturally

[1] Norman Mesher is, throughout the pleadings, referred to as though he were the sole owner of this lot. It, in fact was community property, and on his wife's death their two children, Frank and Shirley Ann, acquired an interest therein and there was an oral stipulation to that effect on the opening day of the trial. When reference is made to a plaintiff herein, we are referring to Norman Mesher, unless the content indicates otherwise.

caused a survey to be made; and its contractor, over the protest of the plaintiff and his daughter, cleared to the line established by the survey.

The plaintiff commenced this action to establish his title by adverse possession to the south 3 feet of the lot acquired by the defendant. The plaintiff, not having paid taxes on this 3-foot strip and having no color of title, bases his action on RCW 4.16.020 which prescribes that actions for the recovery of real property must be brought within 10 years.

The defendant, not having acquired the lot north of the plaintiff's until July 28, 1960, was dependent on the testimony of the owners and occupants of its lot, subsequent to 1934, as to the use made of the 3-foot strip. The evidence was conflicting, but the trial court accepted the testimony of the plaintiff and his daughter as to their use and occupancy of at least the 30 inches north of their lot as platted, *i.e.*, the south 30 inches of the lot purchased by the defendant corporation. Their testimony was given strong support by that of two neighbors who had lived nearby since the early twenties. The trial court made the requisite finding that, since 1934, "plaintiffs have exercised actual, open, notorious, hostile, continuous, exclusive and adverse possession" over the southerly 30 inches of the lot purchased by the defendant.

The law relating to adverse possession is not in dispute. The issue raised is whether there is sufficient credible evidence to establish the elements of adverse possession, particularly whether the plaintiff's possession was hostile and exclusive.


A. *The portion of the strip immediately north of the sidewalk which, as indicated, is 62 feet in length and parallel with the plaintiff's house.*

Reference has already been made to the overhanging eaves in this area.

The plaintiff testified that they had, at all times, cut the grass for 3 feet north of the sidewalk. The plaintiff's

daughter, Shirley Ann Mesher (see footnote 1) testified that she had cut the grass north of the sidewalk to what they believed to be their property line. A neighbor testified to having seen her mowing grass north of the sidewalk for "about three feet." A defense witness, the owner of the house on the lot north of the plaintiff's (1939-1945), conceded that the plaintiff's gardener always cut the grass for "half a lawn mower's length north" of the sidewalk.

The area between the two houses was lawn and there was little that could be done to evidence a claim of ownership other than to cut the grass in the portion of the strip immediately north of the sidewalk. This must be considered with the dominion exercised in the other two segments.

B. *The portion of the strip in the area between the plaintiff's house and the alley (an east-west distance of approximately 28 feet).*

It was agreed that there had been a frame garage, in the southeastern corner of the lot purchased by the defendant, with its south wall on or very close to the south line of the lot and its east wall on the alley line. The location of the south wall of the garage, with reference to the north line of the sidewalk (our point or line of reference), is disputed. The defendant's witnesses located the south wall of the garage on an extension of the north line of the sidewalk, *i.e.,* on the line as platted, or not far north thereof. However, one defense witness testified that the south wall of the garage "might not have been on a direct line with the concrete walk, but it still wouldn't have been too far north," and, then continued, "maybe not any more than two or three feet from where their walk would have been."

The plaintiff and his witnesses put the south wall of the garage a foot or more north of a fence which they testified as having been 3 feet or more north of the north line of the sidewalk.

There was evidence to support the plaintiff's contention that the south wall of the garage had been north of and parallel to the fence he had repaired and replaced, which extended inward from the alley line almost to the sidewalk

and was more than 30 inches (as found by the trial court) north of the north line of the concrete walk extended.

The evidence was conclusive that the plaintiff's family had occupied, used, and cultivated the area south of this garage. One of the earlier occupants of a house on the defendant's lot testified that her family had never had anything to do with maintaining the property along the south side of the garage, "We had no interest in it whatsoever."

C. *The portion of the strip in the area between the plaintiff's house and the street (an east-west distance of approximately 20 feet).* Here the plaintiff had maintained a rockery and taken care of certain plants definitely within the disputed strip.

In segment B, which is east of, and segment C, which is west of segment A, *i.e.*, the area immediately north of the concrete walk, the evidence supports the trial court's finding of open, adverse, and hostile possession by the plaintiff. The flag of his claimed possession was clearly unfurled by maintenance of a rockery and plants, to the west, and his fence, to the east of the area immediately north of the concrete walk and directly between the two houses where there was nothing but lawn.

Prior owners and occupants of the lot, purchased by the defendant, testified that they, or their representatives, had mowed the entire 10 feet of lawn between their house and the plaintiff's concrete sidewalk. The cutting of the entire lawn between the two houses could well have been an act of neighborly accommodation and does not evidence any intent to claim any right of ownership in the 30-inch strip with which we are concerned.

On the other hand, the circumstances and manner of the cutting of a lawn may be an "unfurling of the flag" of hostile ownership. The limitations by the plaintiff of lawn-cutting efforts, between the house on the defendant's lot and the north line of the plaintiff's sidewalk, to a narrow strip adjacent to the sidewalk is much more indicative of a claim of ownership than a cutting of the entire area on occasion by the occupants of the house on the defendant's

lot. Again, to quote a defense witness, "the only visible boundary lines in all the years we lived there was when the grass was freshly cut."

Taken in conjunction with the other evidence, there is substantial evidence to support the trial court's holding (made after a view of the premises) of adverse possession by the plaintiff of at least the south 30 inches of the lot purchased by the defendant.

█ Cases involving adverse possession of narrow strips, such as we have here, extending the full length of residential lots are not unusual. See *El Cerrito, Inc. v. Ryndak* (1962), 60 Wn. (2d) 847, 376 P. (2d) 528 (2½ feet by 109 feet); *Mugaas v. Smith* (1949), 33 Wn. (2d) 429, 206 P. (2d) 332, 9 A.L.R. (2d) 846 (3½ feet by 135 feet); *Skoog v. Seymour* (1947), 29 Wn. (2d) 355, 187 P. (2d) 304 (3½ feet by 172 feet); *Thornely v. Andrews* (1907), 45 Wash. 413, 88 Pac. 757 (2 feet to 2 feet 7 inches by length of lot).

In *Skoog, supra,* we used the following quotation from *Whalen v. Smith* (1918), 183 Iowa 949, 167 N. W. 646, stating the law applicable to such a situation as the present:.

" 'To constitute adverse possession, or to set in operation the statute of limitations, does not necessarily require the claimant to live upon the land, or to enclose it with fences, or to stand guard at all times upon its borders, to oppose the entry of trespassers or hostile claimants. It is enough if the person pleading the statute takes and maintains such possession and exercises such open dominion as ordinarily marks the conduct of owners in general, in holding, managing, and caring for property of like nature and condition.' " (29 Wn. (2d) at p. 364)

And in *El Cerrito, Inc., supra,* where all the contentions here were before the court, we disposed of the hostility issue by saying:

"Appellants further assert that the hostility required to constitute adverse possession is not present, since the record indicates that the parties occupying the adjoining property were friendly and neighborly . . . In the law of adverse possession, 'hostile' does not mean animosity, but is a term of art which means that the claimant is in possession as owner and not in a manner subordinate to the title of the true owner. *Fisher v. Hagstrom,* 35 Wn. (2d)

632, 214 P. (2d) 654 (1950). . . . ." (60 Wn. (2d) at p. 854)

See also *King v. Bassindale* (1923), 127 Wash. 189, 220 Pac. 777.

In *Mugaas, supra,* we said:

"The appellants contend that the respondent has failed to establish adverse possession of the tract in question. The character of the respondent's possession over the statutory period is one of fact, and the trial court's finding in that regard is to be given great weight and will not be overturned unless this court is convinced that the evidence preponderates against that finding. We are of the opinion that the evidence was sufficient to sustain the trial court's findings, and the conclusions based thereon, that the respondent had acquired title to the strip in question by adverse possession. The evidence would have warranted a finding that her adverse possession dated back to 1910." (33 Wn. (2d) at p. 430)

We must concede, as did the trial court, that the factual issues in this case are not free from doubt; but, as in *Mugaas, supra,* the evidence not only does not preponderate against the findings of the trial court, but gives them substantial support. *Varrelman v. Blount* (1960), 56 Wn. (2d) 211, 351 P. (2d) 1039; *Thorndike v. Hesperian Orchards, Inc.* (1959), 54 Wn. (2d) 570, 343 P. (2d) 183.

The judgment is affirmed.

OTT, C. J., ROSELLINI, HUNTER, and HALE, JJ., concur.